**UNITED STATES of America, Appellee,**

v.

**Wesley Warren WELLMAN, Appellant.**

No. 93–3500.

United States Court of Appeals,
Eighth Circuit.

Submitted March 17, 1994.

Decided Aug. 26, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 19, 1994.

Donald Cooley, argued, Springfield, MO, for appellant.

Gregory Johnson, argued, Springfield, MO (Stephen L. Hill, Jr. and Williams G. Crowe, on the brief), for appellee.

Before McMILLIAN, BOWMAN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

BOWMAN, Circuit Judge.

Wesley Warren Wellman appeals his convictions and sentence imposed by the District Court[1] based on drug-trafficking and firearms offenses. We affirm.

## I.

In February 1993, Addis W. Monroe, a county sheriff's deputy, swore an affidavit in support of an application for a search warrant in which he stated that a confidential informant had told him furniture stolen in a recent burglary was in Wellman's mobile home. The warrant issued, and the executing officers found the stolen furniture. When they conducted a pat-down search of Wellman, they found two semiautomatic pistols and a film canister containing methamphetamine packaged for distribution.

In April 1993, an unrelated operation in which undercover officers attempted to purchase methamphetamine from Scott Travis led to Wellman. Another search warrant was executed at Wellman's residence, and officers found on Wellman more methamphetamine and a $100 bill that the undercover officers had given to Travis as buy money in exchange for methamphetamine Travis later delivered to the officers.

Wellman subsequently was charged in federal court under a four-count indictment. Based on the evidence discovered pursuant to the February search, he was charged with one count of possession with intent to distribute methamphetamine and one count of use of a firearm in relation to a drug-trafficking crime. The April evidence led to counts of possession with intent to distribute, and distribution of, methamphetamine.

Wellman was convicted on all four counts. He was sentenced to 151 months imprisonment for the methamphetamine offenses and a consecutive sixty-month term for the firearms offense. Wellman raises four arguments on this appeal. We consider each in turn.

## II.

### A.

Wellman argued at a pretrial suppression hearing that the search warrant was issued without probable cause, and that the government's evidence therefore should have been suppressed. The District Court denied the motion, finding that the affidavit Monroe executed established probable cause for issuance of the warrant. Wellman renews this argument as his first point on appeal.

In the search warrant application, Monroe stated that stolen antique furniture was at Wellman's residence. In the affidavit he executed in support of the application, Monroe stated the extent of his law enforcement experience, that a confidential informant had told him furniture stolen during a recent burglary would be found in Wellman's trailer, and that the informant had been reliable in the past.

Wellman argues that the search warrant application and the affidavit fail to establish the existence of probable cause. He points out that the affidavit offers no basis for the informant's knowledge, fails to describe the furniture specifically (even though the warrant application lists the items), and does not verify that furniture in fact was stolen in the referenced burglary or that Wellman lived in a trailer at the listed address.

---

1. The Honorable Russell G. Clark, Senior United States District Judge for the Western District of Missouri.

During the oral argument of this appeal, the government conceded that the affidavit fails to establish sufficient probable cause to justify the judge's issuance of the search warrant. The government argues, however, that the evidence seized during the execution of the warrant properly was admitted because the good-faith exception of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), applies in this case. We note that it is appropriate for us to apply *Leon's* standards to the facts developed in the District Court, even though that court did not pass on the issue. *See United States v. Sager,* 743 F.2d 1261, 1265–66 (8th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985). We agree with the government that *Leon* applies here, and thus we do not express an opinion as to whether the affidavit submitted in support of the warrant application establishes probable cause.

Under *Leon,* where officers reasonably believed and a judge determined that probable cause existed, suppression of evidence seized pursuant to the resulting search warrant is unnecessary, even if a reviewing court subsequently concludes that the warrant is invalid. In determining whether the officers conducted themselves reasonably, we examine the totality of the circumstances, including information the officers possessed that they did not present to the judge via the affidavit. *United States v. Frangenberg,* 15 F.3d 100, 103 (8th Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 2686, 129 L.Ed.2d 818 (1994) *and petition for cert. filed,* No. 93–9611 (U.S. June 17, 1994).

The evidence adduced at the suppression hearing shows that, at the time he applied for the search warrant, Monroe had significant information, both from the informant's tip and from Monroe's extensive efforts to corroborate that information, to support his conclusion that probable cause existed. Accordingly, we have no difficulty in determining that Monroe (and hence the other officers who executed the search warrant) had an objectively reasonable basis for concluding that probable cause existed.

At the suppression hearing, Monroe testified that the informant stated he personally had seen the items in Wellman's trailer and specifically described some of them. Monroe pulled the police report for the burglary referenced in the informant's tip, but the report did not contain descriptions of the items. Monroe then called the victim, who offered the same descriptions of the items as had the informant, to verify the information in the tip. Monroe further verified the information by telephoning Wellman's wife, who lived with Wellman in the trailer. Wellman's wife acknowledged that the stolen items were present in the trailer. It was at this point that Monroe applied for the search warrant.

Although Monroe corroborated the informant's information before he applied for the search warrant, Wellman contends that the good-faith exception does not apply in this case because the judge was misled by several material false statements in and omissions of fact from the affidavit Monroe executed in support of the search warrant application. Wellman offers specific examples to bolster this argument. The record clearly shows, however, that Monroe did not willfully or recklessly misstate or omit any facts.

First, Wellman claims that Monroe knew Wellman had been having sexual intercourse with the informant's wife, but that Monroe, even though he understood that this fact could reflect poorly on the informant's credibility,[2] did not include it in the affidavit. This fact, although interesting, is irrelevant in light of the additional investigatory work conducted by Monroe. Clearly, Monroe's affidavit was not sworn solely in reliance on the informant's information, and there is no evidence that he intended to mislead the judge by not disclosing the information or that the judge was misled.

Wellman also claims that Monroe misstated the extent of his law enforcement experience. In his affidavit, Monroe stated, "I have been in law enforcement for over eighteen years, I have been affiliated with the Military Service for over twenty years, of which fourteen were in service of the Mili-

---

**2.** The record does not indicate, however, whether the informant knew the defendant was engag-

ing in sexual intercourse with the informant's wife.

tary Police." Affidavit of Addis W. Monroe (Feb. 26, 1993). Monroe acknowledged at the suppression hearing that, although he had been affiliated with the military police, he personally had not served as a military police officer. To the extent Monroe's overstatement of his police experience is relevant to the probable cause determination, we think it is merely the result of an unclear use of language, and does not constitute a knowing or reckless falsehood.

Next, Wellman asserts that Monroe misrepresented in his affidavit the extent to which he had used the informant in the past. Monroe's affidavit stated, "[t]his Confidential Informant has been proven to be reliable on other cases. This Confidential Informant has given information in several other cases resulting in completed investigations and/or felony arrests." *Id.* At the suppression hearing, Monroe stated that the informant had provided him with only one prior tip, specifically, that certain stolen property was to be found in a pawn shop. This information, however, enabled Monroe to solve thirty-five to forty burglaries and led to the convictions of three individuals on felony charges. Again, although Monroe could have used clearer language, he did use a previous tip from the informant "on other cases," and obviously the informant in those cases proved "to be reliable." As with his other less-than-precise statement, we believe Monroe did not intend to mislead the judge. Furthermore, we believe it would be unreasonable were we to demand from a law enforcement officer executing a search warrant—a "nonlawyer[ ] in the midst and haste of a criminal investigation," *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)—the same clarity of language we would expect to find in an appellate lawyer's brief.

Finally, Wellman points out that Monroe admitted at the suppression hearing that he believes in lying on a discretionary basis, according to his own value judgments, in order to combat crime. This line of questioning was not sufficiently developed to be useful with respect to the issue before us. There is no indication that Monroe "discretionarily lied" to the judge who issued the search warrant in this case, or that Monroe believed such conduct ever was appropriate before a judicial officer or while he was under oath. Monroe's statements quite naturally could be taken to mean that he believed it appropriate to lie while engaging in undercover operations or where necessary to protect an informant's identity.[3] In light of the above discussion, Monroe's statements about lying, while bothersome in a general sense, do not lead us to believe that *Leon*'s good-faith exception should not apply in this case.

The thoroughness of the investigation Monroe undertook before applying for the search warrant convinces us that the purpose of the exclusionary rule, which is "to deter police misconduct," *Leon,* 468 U.S. at 916, 104 S.Ct. at 3417, would not be served by suppressing the evidence in this case. Monroe's actions "certainly do[ ] not evidence a cavalier approach to Fourth Amendment protections." *Frangenberg,* 15 F.3d at 103. We hold that the officers' reliance on the search warrant was justified under *Leon*'s good-faith exception to the exclusionary rule, and therefore that the District Court did not err in not suppressing the government's evidence.[4]

### B.

At trial, Scott Travis testified that he had purchased methamphetamine from Wellman, a purchase on which one count against Wellman of possession with intent to distrib-

3. After Wellman's arrest, Monroe came by information that made him seriously doubt the informant's credibility. These doubts, in combination with his desire to protect the informant's identity, prompted Monroe to lie to a representative of the public defender's office when he was interviewed about Wellman's crimes. At the time Monroe executed the affidavit, however, he was convinced the informant was completely reliable. Accordingly, we conclude that this misconduct is not relevant to the *Leon* issue, which turns on the good faith of the officers when the warrant was obtained and executed.

4. We feel it necessary to point out that, while Monroe's police work was thorough, it was his failure to inform the judge via the affidavit of his investigative efforts that provided the defendant with fodder for his suppression motion and for this aspect of the appeal before us.

ute was based. Travis testified under a grant of use immunity, the District Court having ordered him to testify after explaining to Travis that, although he could be prosecuted for acts about which the government already knew, the testimony Travis offered in the Wellman case could not be used against him. (Travis was not granted transactional immunity.) The District Court refused to allow Wellman's counsel to bring out on cross-examination that Travis had been granted use immunity. Wellman's second argument in this appeal is that this ruling by the District Court denied him his Sixth Amendment Confrontation Clause rights. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

■ The government conceded at the oral argument of this appeal that the District Court erred in refusing the cross-examination. We agree. The government argues, however, that the error was harmless beyond a reasonable doubt.[5] Wellman disagrees, of course, arguing that the government had charged him with intent to distribute methamphetamine in April 1993 based on a one-gram purchase Travis made from Wellman, and that the only evidence the government had in support of this count was provided in Travis's testimony. After careful review of the record, we conclude the government is correct.

In examining for harmless error the District Court's refusal to allow Wellman to cross-examine Travis regarding the latter's immunity, we consider "the importance of [Travis's] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of [Travis] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

The government's case was quite strong, even in the absence of Travis's testimony, and almost all of what Travis told the jury already had been the subject of testimony by police officers or could be inferred quite readily from the events described by the officers. Police officers told the jury that, on April 8, 1993, Officer Daniel P. Banasik was making an undercover methamphetamine purchase from Travis. Banasik agreed to purchase "a grand's worth" (a thousand dollar's worth), and Travis indicated he had to call his source. Banasik saw Travis dial a telephone number later identified as Wellman's, and he heard Travis ask the person on the other end for a grand's worth of methamphetamine. Travis agreed to meet his source in the usual place. Banasik then gave Travis $1000 cash and agreed to meet him later at a prearranged location.

Because the police were attempting to identify Travis's source, Banasik knew Travis would be followed by other officers. He thus proceeded to the meeting place while surveilling officers watched Travis drive with his girlfriend to Wellman's residence with the $1000. The officers then watched Travis as he proceeded to his and Banasik's prearranged meeting place. When Travis arrived, he returned the $1000 to Banasik and explained to Banasik that the source had not understood the request, having mistaken the order for a "grand's worth" as an order for a "gram's worth." Travis stated that the source did not have a grand's worth to sell. The source did have a gram's worth, however, that Banasik could try. Travis told Banasik he did not buy the gram from the source because he did not know if Banasik would want the smaller quantity.

Banasik agreed to purchase a gram of methamphetamine from Travis, and told Travis he would buy more later if he liked it. Travis again dialed Wellman's number, told the person on the other end to bring the stuff to the store, and hung up. Banasik gave Travis a $100 bill, and Travis told Banasik to leave so Banasik would not see who his source was. Banasik left, but other officers observed Wellman drive up, meet with Travis, and drive away. Banasik returned as instructed and Travis then gave him a gram of methamphetamine. Shortly thereafter,

---

**5.** The government also argues that Wellman failed to preserve the Confrontation Clause issue for appeal. We assume without deciding that this issue is properly before us on this appeal.

Travis was arrested and questioned, and he agreed to cooperate with the authorities. The $100 bill was discovered on Wellman that evening when the search warrant was executed.

Travis told the jury the same tale as had the officers. He filled in obvious gaps, though, as when he told the jury that it had been Wellman whom he had called. Most of Travis's testimony was merely redundant to that of the officers. Travis did add two pieces of original testimony: he told the jury that he had been purchasing methamphetamine from Wellman since 1986, and he relayed a comment Wellman allegedly made to Travis, after the February search but before the April search, to the effect that the officers had not found all of his drugs during the February search and that he still was selling methamphetamine. In the context of this case, however, this original testimony does not militate against a conclusion that the Confrontation Clause error was harmless.

In his defense, Wellman testified that he received the $100 from Travis because Travis owed him money, and he argued that, because the undercover officers had not searched Travis, the female who accompanied Travis, or Travis's car, the government could not be sure that Travis or his girlfriend was not the source of the gram of methamphetamine. The jury quite easily could have inferred from the chain of events described by the officers, however, that Travis did not go through the motions of calling Wellman twice, travelling to Wellman's residence, and waiting at the store for Wellman just to give him the $100 bill and then give Banasik a gram of methamphetamine that Travis had been carrying all along.

Wellman also claimed that he was a user, but not a seller, of methamphetamine. The officers and other government witnesses, however, testified that the scales found at Wellman's residence (Wellman purchased a second scale after the first was seized by the officers in February) were of the type used by drug sellers, that both contained methamphetamine residue, and that mere users rarely weigh the drugs they purchase. There also was testimony that the several small plastic-wrapped quantities of methamphet-amine found on Wellman were indicative of his role as a drug distributor, because the significant amounts of the drug lost on the individual plastic wrappers make packaging small quantities in this manner so wasteful as to be impractical for a user. In light of the extensive physical evidence, the expert testimony, and the officers' testimony, Travis's testimony would have had little additional effect on a jury asked to decide whether Wellman had sold the methamphetamine to Travis.

Furthermore, Wellman's cross-examination of Travis was most extensive and skillful. Travis acknowledged on direct examination that he still faced charges for having sold the methamphetamine to Banasik. The following exchange then took place on cross-examination:

Counsel for Wellman: And at that time [of the arrest on April 8] they [the arresting officers] asked you to work with them; is that what your testimony is?

Travis: To work with them?

Counsel for Wellman: Yes.

Travis: Cooperate with them—

Counsel for Wellman: Cooperate with them?

Travis: —is what they said.

Counsel for Wellman: Now, tell the jury what it means when you cooperate. Does that mean you get favors later in your case?

Travis: I have been dealt no favors.

Counsel for Wellman: Answer my question, sir.

Travis: No, they did not say that I would get no favors.

Counsel for Wellman: So you just thought at that particular time, since you'd been busted, you'd be a good Samaritan?

Travis: I don't know if that means a good Samaritan or not.

Counsel for Wellman: Isn't it true that at that time you decided to make a conscious effort to bust my client so you could get out of more trouble than you were already in?

Travis: More trouble than I were already in?

Counsel for Wellman: Mm-hmm?

Travis: No, sir, I don't really think of it like that.

Transcript of Trial Proceedings Vol. II at 210–11.

After examining the record, we are convinced that Wellman's inability to bring out on cross-examination that Travis was testifying under a grant of use immunity in no way contributed to Wellman's convictions. Accordingly, under *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438, we conclude that the District Court's error in refusing to allow Wellman to cross-examine Travis regarding the grant of immunity was harmless beyond a reasonable doubt. *See Lufkins v. Leapley*, 965 F.2d 1477, 1481 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 271, 121 L.Ed.2d 200 (1992).

### C.

█ As discussed above, Wellman was convicted on two counts of possession of methamphetamine with intent to distribute. Wellman's third argument on this appeal is that the District Court erred by failing to instruct the jury on simple possession of methamphetamine, a lesser-included offense of possession with intent to distribute.

Wellman, however, did not request an instruction on the lesser-included offense, and he did not object to the District Court's omission of such an instruction. Accordingly, we review the District Court's failure to instruct on the lesser-included offense under the plain error standard. *United States v. Cuny*, 784 F.2d 853, 854 (8th Cir.1986). The evidence was abundant to show that Wellman, although he may have been a user of methamphetamine, also sold methamphetamine to Travis. We conclude that Wellman has fallen far short of showing that the District Court committed plain error by not volunteering an instruction for Wellman on the lesser-included offense. *See United States v. Johnson*, 12 F.3d 827, 835 (8th Cir.) (setting forth test for plain error), *cert. denied*, —— U.S. ——, 114 S.Ct. 1860, 128 L.Ed.2d 482 (1994).

### D.

At trial, Travis testified that, based on the regularity and quantities of his purchases of methamphetamine from Wellman between 1986 and 1993, he had purchased over 1000 grams of methamphetamine from Wellman. The District Court used this quantity of drugs in sentencing Wellman. On appeal, Wellman argues that the District Court erred in using this quantity when sentencing him because Travis was not a credible witness and the drug quantity was speculative.

At the sentencing hearing the District Court stated that it found Travis's testimony credible and the quantity of drugs calculated in the Presentence Report correct. These findings are reviewed for clear error. *United States v. Nash*, 929 F.2d 356, 358 (8th Cir.1991). No clear error appearing on the record before us, we sustain the District Court's finding as to the quantity of methamphetamine attributable to Wellman for sentencing purposes.

### III.

For the reasons stated above, we affirm Wellman's convictions and sentence.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent from Part II(B) of the majority opinion because I do not agree that the district court's constitutional error in denying Wellman's counsel the right to bring out Travis's grant of immunity was harmless beyond a reasonable doubt. Accordingly, I would reverse the conviction and order the district court to grant a new trial.